**HOGAN LOVELLS US LLP**
TRENTON H. NORRIS (Bar No. 164781)
4 Embarcadero Center, Suite 3500
San Francisco, California 94111
Telephone: (415) 374-2300
Facsimile: (415) 374-2499
trent.norris@hoganlovells.com

MICHAEL L. TURRILL (Bar No. 185263)
JOSEPH R. O'CONNOR (Bar No. 274421)
1999 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
Telephone:(310) 785-4600
Facsimile:(310) 785-4601
michael.turrill@hoganlovells.com
joe.oconnor@hoganlovells.com

REBECCA C. MANDEL (*pro hac vice*)
555 Thirteenth Street, NW
Washington, D.C. 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
rebecca.mandel@hoganlovells.com

*Attorneys for Defendants and Counter-Claimant*
JONECA COMPANY, LLC and
THE JONECA CORPORATION

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| INSINKERATOR LLC, a Delaware limited liability company,<br><br>    Plaintiff,<br><br>  vs.<br><br>JONECA COMPANY LLC, a Delaware limited liability company, and THE JONECA CORPORATION, a California corporation,<br><br>    Defendants. | Case No.: 8:24-cv-02600-JVS-ADS<br><br>Action Filed: November 27, 2024<br><br>**DEFENDANTS JONECA CO., LLC AND THE JONECA CORP.'S OPPOSITION TO PLAINTIFF INSINKERATOR LLC'S MOTION TO ENFORCE PRELIMINARY INJUNCTION** |
| JONECA COMPANY, LLC, a Delaware limited liability company,<br><br>    Counter-Claimant,<br><br>  vs.<br><br>INSINKERATOR LLC, a Delaware limited liability company,<br><br>    Counter-Defendant. | REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL<br><br>Judge:  Honorable James V. Selna<br>Date:   October 20, 2025<br>Time:   1:30 p.m.<br>Dept:   Courtroom 10C |

HOGAN LOVELLS US LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................1

II.     BACKGROUND .................................................................................................2

  A.   Procedural Background ...............................................................................2

  B.   ISE's Inadequate Meet-and-Confer Efforts................................................3

  C.   Joneca's Extensive Compliance Efforts .....................................................4

III.    LEGAL STANDARD .........................................................................................7

IV.     ARGUMENT.......................................................................................................8

  A.   Joneca Has Taken All Reasonable Steps To Substantially Comply Regarding Packaging...................................................................................8

  B.   Joneca Is In Compliance Regarding In-Store Signage and Displays............13

  C.   Joneca Is In Compliance Regarding Online Promotional Materials.............15

  D.   Online Search Results Pages Are Not Encompassed By The Order.............18

  E.   Coercive Sanctions Are Not Warranted. ....................................................20

V.      CONCLUSION ..................................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Dual-Deck Video Cassette Recorder Antitrust Litig.*,
    10 F.3d 693 (9th Cir. 1993) .............................................................................*passim*

*FTC v. Affordable Media*,
    179 F.3d 1228 (9th Cir. 1999) ................................................................................. 7

*Gen. Signal Corp. v. Donallco, Inc.*,
    787 F.2d 1376 (9th Cir. 1986) ................................................................................. 7

*Harbor Breeze Corp. v. Newport Landing Sportfishing, Inc.*,
    2020 WL 816135 (C.D. Cal. Jan. 23, 2020) .......................................................... 21

*Homeland Housewares, LLC v. Euro-Pro Operating LLC*,
    2015 WL 12746229 (C.D. Cal. Apr. 21, 2015) ..................................................... 12

*Lab./Cmty. Strategy Ctr. v. L.A. Cnty. Metro. Transp. Auth.*,
    564 F.3d 1115 (9th Cir. 2009) ............................................................................ 2, 8

*Reno Air Racing Ass'n, Inc. v. McCord*,
    452 F.3d 1126 (9th Cir. 2006) ........................................................................... 8, 15

*Shell Offshore Inc. v. Greenpeace, Inc.*,
    815 F. 3d 623 (9th Cir. 2016) ................................................................................ 21

*Stone v. City & Cnty. of S.F.*,
    968 F.2d 850 (9th Cir. 1992) .......................................................................... 1, 8, 12

*Taggart v. Lorenzen*,
    587 U.S. 554 (2019) ................................................................................................ 8

**Other Authorities**

Fed. R. Evid. §§ 602, 802 ............................................................................................ 9

C.D. Cal. Local Civil Rule 7-3 ..................................................................................... 4

## I. INTRODUCTION

The motion by Plaintiff InSinkErator ("ISE") against Defendants Joneca Company, LLC and The Joneca Corporation (together, "Joneca") to enforce the Court's Order Regarding Motion for Preliminary Injunction ("Order") is completely unjustified. Joneca has diligently complied with the Order, taking "all reasonable steps within [its] power"—and then some. *Stone v. City & Cnty. of S.F.*, 968 F.2d 850, 856 (9th Cir. 1992). Joneca's extensive efforts comprise no less than ███████ in expenses, including ████████ of employee hours, to label ████████ of packages with the disclaimer, apply the disclaimer to signage and displays at ████████ of stores nationwide, and clearly and conspicuously implement the disclaimer on websites where Joneca-made products are sold. Declaration of Jonathan Chavez ("Chavez Decl.") ¶2.

In the face of this overwhelming factual record, ISE has scoured the country for any potential "gotcha," no matter how small, apparently trying to hold Joneca to a standard of *perfection*, which is not the law. Now ISE brings an oppressive motion designed to broaden the Order, achieve relief it wanted but did not get the first time around, and further strain the resources of its much smaller competitor.

ISE claims to have "uncovered widespread noncompliance" with respect to the Order's provisions regarding in-store packaging, signage and displays, and websites. Motion ("Mot.") at 1. Far from it. Rather than showing store shelves "stocked" with unstickered product, *id.*, ISE proffers unsubstantiated photographs of at most a handful of unstickered units across a few stores. Chavez Decl. ¶15. ISE's photographs consistently show only one panel of the package, rendering it impossible to tell if the sticker is actually missing, or simply on a different panel of a package that got rotated on the shelf. *Id.* ¶16. Moreover, the identified packages are nearly always damaged or mixed in with several stickered packages. *Id.* ¶25. In some cases, ISE's own evidence shows *only* units that are stickered. *Id.* ¶17. This accords with Joneca's own records and visits to stores, which confirm the overwhelming majority

of products are labeled with the required disclaimer. Chavez Decl. ¶¶8-14; Declaration of Justine Chang ("Chang Decl.") ¶¶3-8; Declaration of Angie McGinnis ("McGinnis Decl.") ¶¶3-8; Declaration of Rebecca Mandel ("Mandel Decl.") ¶¶12- 14.

As for the allegations that Joneca has violated the Order by "trumpet[ing]" horsepower claims on in-store signage and displays, Mot. at 1, ISE has not provided a single example of true signage or displays without a disclaimer, instead trying to broaden the scope of the injunction to include "price placards" that were previously excluded from scope despite ISE's request. *See* Mot. at 1.

Nor has ISE provided an example of any website for Joneca's products that lacks a clear and conspicuous disclaimer. *See id*. Instead, ISE attempts to retread its prior draconian requests—not accepted by this Court—that disclaimers be applied at each mention of horsepower, or else horsepower may not be referenced at all.

To prevail on its motion, ISE must show "(1) that [Joneca] violated the court order, (2) beyond substantial compliance, (3) not based on a good faith and reasonable interpretation of the order, (4) by clear and convincing evidence." *Lab./Cmty. Strategy Ctr. v. L.A. Cnty. Metro. Transp. Auth.*, 564 F.3d 1115, 1123 (9th Cir. 2009). ISE does not even come close to meeting its burden. The Court should reject ISE's overreach and deny its Motion in full.

## II.    BACKGROUND

### A. Procedural Background

On December 6, 2024, ISE filed a Motion for Preliminary Injunction, ECF 22, 22-1, which Joneca opposed. ECF 38. The Court granted ISE's motion on January 10, 2025. ECF 71.[1] The Order required Joneca to place a disclaimer on its packaging stating: "Horsepower claimed on package does not indicate motor output or motor power applied for processing." *Id.* at 17-19. The Court also ordered Joneca not to

---

[1] Joneca appealed the Order to the U.S. Court of Appeals for the Ninth Circuit. Oral argument occurred on August 22, 2025. As of this filing, no decision has been issued.

assist, permit, or cause the continued display of such horsepower claims on online and offline promotional materials, including websites and in-store signage and displays. *Id.* at 19.

Joneca submitted proposed packaging mock-ups on January 28, 2025, ECF 80, which the Court approved with two modest modifications on February 7, 2025, ECF 92. On March 24, 2025, Joneca provided a compliance report regarding its injunction compliance efforts. ECF 104. Joneca has since completed these efforts, as detailed in Section II.C.

On August 27, 2025, ISE filed the instant Motion. On September 8, 2025, Joneca moved to increase the preliminary injunction bond from $500,000 to  to account for the actual, provable costs Joneca has incurred. ECF 143.

**B. ISE's Inadequate Meet-and-Confer Efforts**

ISE's prior counsel first wrote to Joneca's counsel on May 13, 2025, vaguely alleging various compliance issues. Mandel Decl. ¶2. ISE claimed there were stores where packages were not stickered at all or only some packages were stickered, but did not identify any specific stores. *Id.* ISE similarly alleged that signage, displays, and placards at some stores did not include a disclaimer, but again provided no examples. *Id.*

Joneca's counsel responded within one week, describing Joneca's compliance efforts and offering to investigate the circumstances at any specific stores and take appropriate curative measures. *Id.* ¶3. ISE responded over two weeks later with a few purported examples of unstickered packages and one example of allegedly deficient "signage." *Id.* ¶4. Critically, ISE's examples were devoid of information necessary for Joneca to investigate, such as the dates of store visits, and the quantities of stickered and unstickered packages. *Id.* ISE's single example of purported noncompliant signage was of a price placard—not an in-store sign or display.

Joneca investigated to the best of its ability given the limited information it had and, at the parties' first meet-and-confer on June 13, 2025, counsel detailed

Joneca's extensive stickering efforts and shared the most likely explanations for why a *de minimis* amount of product nonetheless may have escaped stickering. *Id.* Joneca's counsel reiterated the request for information required to investigate and further requested ISE provide any instances of unstickered in-store signage aside from the price placard example, as well as any real-world examples of disclaimers on third-party online *search results* pages. *Id.* ¶5.

ISE did not provide any of this information in its next letter. *Id.* ¶6. Instead, ISE provided a few more examples of purportedly non-compliant packaging, again lacking necessary details. *Id.* Joneca replied to ISE on July 3, 2025 and again expressed willingness to remedy issues if ISE would provide basic information. *Id.* ¶7.

Joneca heard nothing for seven weeks, until ISE's new counsel asked for another meet-and-confer. *Id.* ¶8. During this meeting on August 20, 2025, Joneca reiterated its requests for information, sought ISE's proposals for technologically feasible changes to websites, and offered to continue working with ISE to resolve any remaining concerns. *Id.* However, at the conclusion of the call, ISE's counsel abruptly stated the parties had reached an "impasse" and indicated ISE's intention to file the instant Motion. *Id.* Only after this unilateral assertion of impasse did Joneca decline ISE's request to provide further information about its compliance efforts given the impending motion. *Id.* ¶11.[2]

### C. Joneca's Extensive Compliance Efforts

Joneca has invested over ███████ to label packages, update signage and displays, and implement the disclaimer on websites. Chavez Decl. ¶2. Joneca's efforts to comply with the Order include, but are not limited to:

---

[2] ISE did not satisfy Local Civil Rule 7-3. ISE's decision to withhold basic information, such as the dates of its visits to retail stores, only to provide it as ammunition for this Motion, and its refusal to engage in constructive discussion regarding potential updates to online websites short of removing all references to horsepower, show that rather than "attempt[ing] to resolve these issues directly with Joneca," Mot. at 8, ISE always intended to seek court intervention.

1    <u>Product Packaging:</u>  Joneca implemented simultaneous workstreams to update

2  packaging.  *Id.* ¶3.  For customers that preferred to handle in-house or through their

3  own vendor, Joneca provided detailed instructions and complimentary materials to

4  facilitate stickering of ███████████, and followed up with each customer

5  regarding implementation.  *Id.*

6    For other customers, Joneca engaged a third-party contractor, which spent

7  █████████ visiting ████████ of stores and distribution centers to relabel nearly

8  █████████ already disseminated across all 50 States.  *Id.* ¶4.  Joneca devised a

9  structured approach for this enormous logistical operation.  *Id.*  To make the biggest

10  impact soonest, Joneca focused first on locations with the most inventory.  *Id.*  From

11  there, Joneca's contractor worked its way to smaller stores with fewer units in stock.

12  *Id.*  At each location, the contractor recorded how many units were in stock and of

13  what horsepower classification, photographed stickered product, and obtained signed

14  attestations from store managers verifying the visit.  *Id.*

15    This effort required significant cooperation from Joneca's customers,

16  including additional contractual agreements, access to stores and to all relevant

17  inventory, and security assurances.  *Id.* ¶5.  Joneca does not have full access to its

18  customers' premises or visibility into detailed customer inventory information, but

19  every indicator, including detailed reporting from Joneca's contractor, analysis of

20  information regarding current inventory levels versus the amount of inventory

21  relabeled, and phone calls to stores demonstrates Joneca's diligent and

22  comprehensive relabeling efforts have covered the overwhelming majority of units

23  on store shelves.  *Id.*

24    In the meantime, Joneca shipped new inventory to customers bearing the

25  disclaimer.  *Id.* ¶6.  To achieve this, Joneca had to design the labels, including

26  coordination with customers on the redesign and requalification of product

27  packaging, and then apply them at its factory and warehouse to ███████████

28  (and counting).  *Id.*

In total, Joneca effectuated the labeling of more than ███████ of inventory to comply with the Order. *Id.* ¶7. For a frame of reference, there are approximately ██████ in stores at this time, meaning the total number of units covered by Joneca's relabeling efforts is approximately ██████ the typical and current inventory levels for Joneca's customers. *Id.*

<u>In-Store Signage and Displays</u>: Joneca also worked closely with customers to ensure signage and displays that mention horsepower include the required disclaimer. *Id.* ¶33. Joneca either designed new signage for its customers or worked together with customers to co-design their signage. *Id.* To install signage and displays, Joneca offered retailers options that best fit their needs. Some opted to use a contractor provided at Joneca's cost. *Id.* For retailers that opted to handle in-house, Joneca paid to print and ship all updated signage and displays and provided detailed instructions for installation. *Id.* Joneca also advised its customers that any new signage or displays that may be installed in the future must contain the required disclaimer. *Id.* ¶34.

<u>Online Updates</u>: Joneca diligently updated all websites on which its products are sold to include a clear and conspicuous disclaimer. *Id.* ¶37. This effort required approximately ██████ in labor, as Joneca coordinated with ██████████ to implement the disclaimer in the manner best suited to each customer across ██████ individual webpages. *Id.* As a practical matter, each customer's website is designed differently. *Id.* ¶38. This means Joneca could not apply a one-size-fits-all method to implementing the 98-character disclaimer on every website, but instead needed to account for each website's specific restrictions on structure, format, and content. *Id.* In all instances, Joneca implemented the disclaimer at the *first feasible mention* of horsepower on each website. *Id.* ¶39. For almost all websites, this means bolded font in descriptive text on the product landing page or the first bullet point, and the first banner or carousel image that references horsepower. *Id.*

1      Joneca's approach and placement of the disclaimer is consistent with other

2 product websites containing disclaimers.  Indeed, ISE itself has added disclaimers to

3 its horsepower advertising for its Builder series garbage disposals, presumably in

4 response to Joneca's meritorious counterclaim.  *Id.* ¶¶52-53.  ISE's disclaimer

5 appears only once on the product description page and requires the user to click or

6 scroll down the product page to view.  *Id.*

7      Ultimately, for the reasons explained below, Joneca's thorough and

8 methodical efforts are far from "spotty," "trivial," and "inadequate," Mot. at 3.  They

9 demonstrate not merely substantial compliance but also good faith, reasonable, and

10 diligent implementation of the Order.

11 **III.     LEGAL STANDARD**

12      Though notably missing from ISE's Motion, the legal standard for finding a

13 party in civil contempt is "well settled":  The moving party has the burden of showing

14 by clear and convincing evidence violation of a specific and definite order of the

15 court.[3]  *FTC v. Affordable Media*, 179 F.3d 1228, 1239 (9th Cir. 1999) (citation

16 omitted).  If shown, the burden then shifts to the non-moving party to "demonstrate

17 why they were unable to comply."  *Id.*

18      "[S]ubstantial compliance with a court order is a defense to an action for civil

19 contempt."  *Gen. Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1379 (9th Cir. 1986).

20 Substantial compliance is demonstrated where a party "has "taken all reasonable

21 steps to comply" with applicable court orders, resulting in merely "technical or

22 inadvertant [sic] violations."  *Id.*  "'Substantial compliance' with [a] court order. . .

23 is not vitiated by 'a few technical violations' where every reasonable effort has been

24 made to comply."  *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d

25 693, 695 (9th Cir. 1993) (internal citation omitted). Contempt sanctions are also not

26 warranted where a party's actions "appear[] to be based on a good faith and

27

28   [3]    Although styled as a "Motion to Enforce Preliminary Injunction," ISE's Motion seeks contempt remedies.  *See* Mot. at 14-15.

1  reasonable interpretation of the [court's order]." *Id.* "If an injunction does not clearly

2  describe prohibited or required conduct, it is not enforceable by contempt." *Reno Air*

3  *Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1132 (9th Cir. 2006).

4      Taken together, ISE must demonstrate (1) that Joneca violated the Order, (2)

5  beyond substantial compliance, (3) not based on a good faith and reasonable

6  interpretation of the order, and (4) by clear and convincing evidence. *See Lab./Cmty.*

7  *Strategy Ctr.*, 564 F.3d at 1123. "[C]ivil contempt should not be resorted to where

8  there is [a] fair ground of doubt as to the wrongfulness of the defendant's conduct."

9  *Taggart v. Lorenzen*, 587 U.S. 554, 561 (2019) (internal quotations and citation

10  omitted).

11  **IV.    ARGUMENT**

12      ISE's Motion has no support in law or fact and should never have been

13  brought.  ISE cannot satisfy its burden of proving by clear and convincing evidence

14  any of its alleged violations.

15  **A. Joneca Has Taken All Reasonable Steps To Substantially Comply**

16     **Regarding Packaging.**

17      Joneca has taken "all reasonable steps within its power" to meet its obligations

18  under the Order regarding in-store packaging, including investing over ███████

19  to effectuate labeling of the *overwhelming majority* of units on store shelves.  *See*

20  *Stone*, 968 F.2d at 856; *supra* Section II.C.  Far from stickering "a few token"

21  packages, Mot. at 4, as ISE baselessly alleges, Joneca's diligent and comprehensive

22  efforts have covered over ███████.  Chavez Decl. ¶7.  The number of units that

23  have been labeled at Joneca's factory and warehouse or by third-party contractors at

24  stores and distribution centers now far outnumbers current inventory levels.  *Id.*

25  Joneca's estimate of current inventory in stores is ██████, less than a quarter of the

26  volume of units Joneca has stickered.  *Id.*  Given the universe of packages labeled by

27  Joneca, any quantity that escaped these extensive efforts can only be described as *de*

28  *minimis*.  *Id.*

1    ISE purports to identify a few dozen units out of ████████████ as

2  noncompliant.  ISE's flimsy evidence is far from clear and convincing.[4]  Indeed,

3  ISE's photos are not sufficient to identify, let alone confirm, *any* purported violations.

4  As an initial matter, ISE's photos show only one side of packaging, *id.* ¶16.  ISE did

5  not submit photographs of each package panel, nor did its investigators attest they

6  looked at every side of the packages.  *Cf.* ECF 71 at 18 n.10 (indicating placement of

7  sticker on "front" of package).   Panels sometimes look quite similar and packages

8  on store shelves at times may be rotated; if ISE's investigators failed to examine the

9  cartons in full, any allegation of "missing" stickers cannot be substantiated.  *Id.* ¶16.

10  Other photos are too blurry to even assess, or actually show only products that *do*

11  bear the required disclaimer, *id.* ¶17.

12    Fundamentally, ISE's claims of unstickered packages do not make sense in

13  light of the extent of Joneca's stickering efforts.  Take an example ISE offers from

14  Home Depot Store #2550 in Gaithersburg, Maryland from a visit on May 1, 2025.

15  ISE claims, incredibly, that it found Joneca's disposals "had no stickers at all."

16  Declaration of Adeline C. Schmidt ("Schmidt Decl.") ¶5.  To support this allegation,

17  ISE submitted one photo claiming **two** unstickered disposers, one of which is visibly

18  damaged.  Chavez Decl. ¶19.  Joneca's contractor, however, visited this exact store

19  ████████████ in inventory.

20  *Id.*   Nor is this scenario an outlier:  ISE repeatedly claims unstickered packages at

21  stores where Joneca's contractor stickered large inventories.  *See id.* ¶¶20-24; Exs.

22  21-24.  ISE's claims are further belied by Joneca's own store visits, which confirmed

23  the vast majority of packages on shelves are stickered.  *See* Chavez Decl.  ¶¶8-14;

24  Chang Decl. ¶¶3-8; McGinnis Decl.¶¶3-8; Mandel ¶¶12-14.

25  ─────────────

26  [4]    Joneca objects to Paragraphs 3, 4, and 5 of the Declaration of Adeline C.
Schmidt on the grounds that these statements lack foundation and constitute hearsay.
27  Fed. R. Evid. §§ 602, 802.  These paragraphs vaguely describe store visits and purport
to verify photos taken neither by Ms. Schmidt, nor even another ISE employee, but
28  rather by third parties at Emerson Electric Co. and Pinnacle Marketing.  The photos
are not business records of ISE and there is no hearsay exception that applies to
render the materials admissible.

9

Even assuming any of the packages identified by ISE are in fact unlabeled (which ISE had not demonstrated and Joneca does not concede), at most, ISE's photos show a handful of unlabeled units mixed in with labeled units, or one or two unlabeled units standing apart from the rest of the inventory, which are often damaged. *Id.* ¶25. Based on the limited information ISE has provided, there a few possible explanations for potential small amounts of unstickered packages:

*Customer Returns.*

Many, if not most, instances of legitimately unlabeled units may be due to customer returns of units purchased *before* a store's inventory was stickered. Almost all examples ISE offers are from Home Depot. Data available to Joneca indicates that between April 23 and July 23, 2025—the precise time period ISE was hunting for purported violations—Home Depot received almost ██████ of Joneca products. *Id.* ¶27. These returns are not unusual, as Home Depot offers a generous 90-day return policy that customers frequently utilize. *Id.* Unsurprisingly, many of the alleged unstickered packages appear to be damaged in a manner indicative of returned products – they are often torn open, ripped, or bent. *See, e.g.*, Chavez Decl. Ex. 11.

Though Joneca cannot confirm for sure, Home Depot Store #106 in Kennesaw, Georgia may reflect an example of a customer return situation. Joneaca's contractor visited the store on April 5, 2025. *Id.* ¶29. At the time the contractor visited the store, there were 32 1/2 HP units in stock and *no* 1 HP units. *Id.* All units ISE claims it found unstickered when it visited this same store on June 5, 2025 were 1 HP units. Schmidt Decl. ¶4. ISE's photograph from its visit on June 5, 2025 shows that the packaging on three of the four units is ripped (in precisely the location where the disclaimer sticker could be found) and the fourth unit in the picture is arranged such that the front panel of the package cannot be seen. Chavez Decl. ¶29. To the extent that the mystery packages in ISE's photograph actually reflect legitimately unstickered packages (which Joneca does not concede), the unstickered units that ISE

1  found were most likely sold before Joneca's contractor visited the store and returned

2  after the contractor visited and stickered the store's entire inventory.  Joneca cannot

3  reasonably police the nationwide market for potential one-off returns. [5]

4          *In-Transit Home Depot Inventory.*

5          Almost every example cited in ISE's Motion is from Home Depot.

6  ███████████████████████████████████████████████████████████

7  ███████████████████████████████████████████████████████████

8  ███████████████████████████████████.  Chavez Decl. ¶30.  As such, although

9  all new packages shipped to stores from Joneca's factory bear the disclaimer, and

10  packages at Home Depot's stores were stickered by Joneca's contractor, it is possible

11  that a small number of unlabeled units could have been in transit and arrived after the

12  stickering effort.  *Id.*  Given the complex distribution networks with product

13  constantly on the move, there are practical limitations to the stickering effort, and to

14  Joneca's visibility into inventory movement within Home Depot's channels.  *Id.*  It

15  is Joneca's good faith belief that, if certain product in transit did escape stickering, it

16  represents but a tiny fraction of Joneca's overall inventory with Home Depot.  *Id.*

17          *Inventory Unavailable To Contractor.*

18          While Joneca's customers were cooperative with the labeling process, it is also

19  possible that in some instances, stores did not, for whatever reason, make every unit

20  of inventory available to Joneca's contractor to sticker.  *Id.* ¶31.  Although Joneca

21  made clear to retailers that they should make all units on shelves, overhead, and in

22  backroom storage areas available to its contractor for stickering, Joneca can neither

23  control—nor even know or evaluate—the extent to which any package was

---

[5]    Indeed, while Joneca is able to get an aggregate indication of total returns, Joneca does not receive real-time, store-level information that would allow it to track returns of potentially unstickered packages in any feasible way. Chavez Decl. ¶27.

overlooked because a particular store's employees did not make the packages available to sticker. *Id.*[6]

These explanations demonstrate that although Joneca has taken all reasonable steps within *its own power* to comply with the Order, there are factors beyond Joneca's control. *See Stone*, 968 F.2d at 856. If a few units slipped through the cracks despite Joneca's extensive efforts, they most certainly do not reflect a lack of compliance by Joneca. Courts in this district have held as much where defendants took significantly fewer steps to comply with preliminary injunction orders than Joneca. For example, in *Homeland Housewares, LLC v. Euro-Pro Operating LLC*, the defendant was ordered to remove allegedly false statements from its blender packaging. 2015 WL 12746229 (C.D. Cal. Apr. 21, 2015). The defendant hired contractors to sticker packaging at two retailers, who stickered approximately three-quarters of outstanding stock, and relied on "sell-through" for three other retailers. *Id.* at *1, *3. The plaintiff moved for civil contempt after it sampled about *300* stores and found uncorrected packaging. *Id.* at *4. The court rejected the motion, finding the plaintiff had not shown "by clear and convincing evidence" that the defendant was not in substantial compliance, "despite some technical violations." *Id.* The court explained the "violations" numbered in "dozens, out of tens of thousands of possible units in the store." *Id.* Furthermore, given the plaintiff, like ISE, provided no information "about how stores were selected" the court could not "rule out the possibility that sampling or other statistic errors [] caused the seemingly high hit rates." *Id.* Here, Joneca has taken far *more* extensive efforts and ISE has presented

---

[6]    In addition, for stores with very small inventories, Joneca took the reasonable step of addressing relabeling via sell-through, given the assessed likelihood that unlabeled inventory would have sold and been replaced with labeled product before any visit by Joneca's contractor. Chavez Decl. ¶4. Courts in this district have recognized this is a valid approach to substantially complying with a preliminary injunction order. *See Homeland Housewares*, 2015 WL 12746229, at *3-4 ("It is not clear to the Court that . . . [d]efendant should have anticipated that there might be substantial numbers of units with the old packaging that would not be substantially or entirely sold through by the end of the grace period, given its inventory tracking and its recall/stickering efforts.").

far fewer (if any) samplings of deficient packaging. The overwhelming evidence, confirmed with Joneca's own store visits, shows consumers are encountering the disclaimer on nearly every single package across a range of stores; even if there are instances where one or two packages are not stickered on a shelf with other stickered products, the consumers are still encountering the disclaimers at the point-of-sale. *See, e.g.*, Chavez Decl. Exs. 1-6. As this Circuit has long recognized, "a few technical violations," do not constitute noncompliance by any measure. *In re: Dual-Deck*, 10 F.3d at 695.

In sum, ISE has not carried its burden to prove by clear and convincing evidence a violation of the Order's requirement to sticker packaging. Moreover, Joneca has more than satisfied any shifted burden to show it took all reasonable steps within its power to substantially comply with the Order's in-store packaging provisions.

**B. Joneca Is In Compliance Regarding In-Store Signage and Displays.**

Joneca is similarly in compliance with the Order's provisions concerning signage and displays. The alleged "violations" that ISE has mustered after *months* of searching are not violations at all. ISE points to examples of two price placards (one for Home Depot and one for Lowe's)—the small cards placed by the retailer on the shelf rail that identify the product and its price. *See* Schmidt Decl. ¶6; Declaration of Joanna Stanley, Ex. A at 3. These are not advertisements from the manufacturer, but rather small informational plaques provided by the retailer. ████████████
██████████████████████████████████████████████████████████████████
████████████████ Chavez Decl. ¶35.

Such price placards do not fall within the scope of the Order. The Order clearly refers only to "in-store signage and displays." ECF 71 at 19. ISE previously asked this Court to require the disclaimer to "appear anywhere an incorrect horsepower number appears on any in-store display unit or signage, *or on any point-of-purchase price placards*." ECF 69 at 4. The Court did not adopt this language. *See* ECF 71

1    at 19.  And for good reason, as the primary purpose of placards is merely to convey
2    the price to the consumer and it would not be feasible to legibly add the disclaimer
3    given the small size of the materials.

4         Facing the undeniable exclusion of "price placards" from the Order, ISE
5    attempts now to construe these price placards as "signage." They plainly are not
6    "signage" and there would be little meaning to the term "price placards" if these
7    examples did not qualify as such.  Notably, ISE does not identify a single complaint
8    about actual "signage," such as product banners or display backdrops.  ISE's effort
9    to overstate price placards as "signage" suggests a broader position that *every*
10   mention of horsepower must be accompanied by the disclaimer.  *See* Mot. at 8
11   (claiming the Order "requires that consumers confront the disclaimer where the
12   horsepower claim is made").  But the Court has not endorsed that notion, which is an
13   argument ISE also previously advanced. *See* ECF 69 at 3 (requesting the Order
14   "obscure every instance of" horsepower).  Rather, the Court recognized that a single
15   clear and conspicuous disclaimer affixed to in-store signage, displays, and the
16   product itself adequately ensures the consumer is informed of Joneca's horsepower
17   claims prior to the point-of-sale.  *See* ECF 71 at 19; *see also* ECF 72 at 23:21-24:1
18   ("Mr. Norris:  '[T]he disclaimer . . . would be a single uniform sticker.'  Court:
19   'Right.'  Mr. Norris:  'It would apply to packages, as well as websites and store
20   signage.' Court: 'Right.'").

21        At a minimum, Joneca's belief that the limited materials that are challenged
22   by ISE are price placards that are not covered by the Order stems from an entirely
23   "reasonable interpretation" of the Order, which makes no reference to placards
24   despite the fact ISE explicitly requested such relief.  *See In re Dual-Deck*, 10 F.3d at
25   695 ("[A] person should not be held in contempt if his action 'appears to be based on
26   a good faith and reasonable interpretation of the [court's order].'"); ECF 69 at 4.
27   There is thus absolutely no basis for a finding of contempt or coercive sanctions.  *See*
28

1   *Reno Air*, 452 F.3d at 1132 ("If an injunction does not clearly describe prohibited or

2   required conduct, it is not enforceable by contempt.").

3   **C. Joneca Is In Compliance Regarding Online Promotional Materials.**

4       ISE similarly paints a misleading picture of Joneca's implementation of

5   disclaimers on online product pages.  Here too, Joneca is in compliance with the

6   Order, which does not detail how online references are to be handled.  *See* ECF 71 at

7   17-19.  As set forth below, it simply is not true that Joneca has "buried the disclaimer

8   in fine print."  Mot. at 1.  Rather, Joneca has implemented a clear and conspicuous

9   disclaimer in the most logical, and only technologically feasible, locations on third-

10  party websites that have different design restrictions.  At a minimum, given the

11  Order's silence as to how online disclaimers are to be implemented, Joneca's

12  approach is a reasonable, good faith interpretation.

13      As an initial matter, there is absolutely no basis for ISE's insinuation that in

14  some instances, the disclaimer might appear "not at all," on website pages.  Mot. at

15  7.  ISE does not offer a single example to support its false claim—because there is

16  none.  As far as Joneca is aware, all online product pages for Joneca-made disposers

17  bear the disclaimer.  Chavez Decl. ¶36.  Joneca has worked diligently to implement

18  the disclaimer on ███████ product pages, often in multiple different locations, in

19  ways that take into account variations across third-party websites and are consistent

20  with industry (and even ISE's) practices.  *Id.*

21      Unable to identify any evidence of *missing* disclaimers in violation of the

22  Order, ISE argues that Joneca's *placement* of the disclaimers is not clear and

23  conspicuous.  Mot. at 6-7.   But ISE is not applying a "clear and conspicuous"

24  standard, it is pushing for its own aggressive (burdensome and infeasible) *competitive*

25  *preference*.  Indeed, much like ISE originally and unsuccessfully argued that to be

26  "clear and conspicuous," the disclaimer for physical packaging must appear in a font

27  size "equal to or larger than the 'horsepower' claim stated on that panel of the

28  package" (a font size so large it would literally consume almost the entirety of the

15

1  package), *see* ECF 69 at 4,  ISE vastly overstates what is required to be clear and
2  conspicuous.

3      Contrary to ISE's characterizations, Joneca's online disclaimers are neither
4  "buried" nor in "fine print."  Mot. at 1, 7.  The disclaimer appears at the *first feasible*
5  *mention* of horsepower on the website in the same font size as the horsepower
6  reference it directly follows.  Chavez Decl. ¶39.  In almost all instances, this means
7  the disclaimer is in bolded font on the landing page or the first bullet point.  *Id.*  If
8  some disclaimers appear in an expandable section of the webpage, that is because
9  that section is the first place on the page technologically capable of accommodating
10  the length of the 98-character disclaimer.  *Id.*  Wherever possible, Joneca has also
11  included the disclaimer on the first banner or carousel image that references
12  horsepower.  *Id.*  Joneca provides herewith images depicting Joneca's clear and
13  conspicuous disclaimers across the challenged retailer websites.  Chavez Decl. Exs.
14  28, 30, 32, 34, 36.

15      Each retailer designs its website differently.  *Id.* ¶38.  ████████████
16  ███████████████████████████████████████████████████████████
17  ████████████████████  *Id.*  Joneca thus could not take a one-size-fit-all
18  approach to implementing the disclaimer online.  *Id.*  ISE identifies mentions of
19  horsepower across various website fields, such as in the title and main image,
20  seeming to suggest the disclaimer should be applied at all of them.  *See* Schmidt Decl.
21  Exs. H-V.  These suggestions are either unworkable, as ISE likely knows, or would
22  move the disclaimer to a place that is *less* clear and *less* conspicuous than it currently
23  is.  For each website page challenged by ISE, Joneca provides herewith a chart
24  comparing the locations red-circled by ISE in its exhibits with the technological
25  limitations of the location and/or superior alternatives for a disclaimer.  Chavez Decl.
26  Exs. 29, 31, 33, 35, 37.

27      ISE takes particular issue with the disclaimer's placement on Home Depot's
28  website.  *See* Mot. at 7.  ████████████████████████████████████████

1 ████████████████████████████████████████████████████

2 ██████████████████████████████████ *See* Chavez Decl. Ex. 35.   In

3 other instances, Home Depot's own policies prohibit the changes ISE seeks. █

4 █████████████████████████████████████████████████████

5 ███████████████████ Joneca reasonably implemented the disclaimer in the

6 most clear and conspicuous spots possible on Home Depot's website, namely in the

7 "Product Details"—the earliest space on Home Depot's website capable of

8 accommodating the disclaimer—in the *first* bullet point.  *Id.* ¶49.  Joneca also

9 included the disclaimer in **two** additional places on Home Depot's website:  first, in

10 bold 14-point font on the first carousel image where horsepower is mentioned and

11 again on an image of the carton, in 14-point font directly below the horsepower claim.

12 *Id.*  Joneca's disclaimers are both clear and conspicuous and eminently reasonable in

13 light of Home Depot's online platform restrictions.

14      Moreover, the location of the disclaimer is not buried "in places where

15 consumers are unlikely to see it," as ISE suggests.  Mot. at 1.  To the contrary,

16 Joneca's approach puts the disclaimer exactly where consumers would expect one.

17 In order to confirm the reasonableness of its online disclaimer implementation,

18 Joneca surveyed numerous other product websites containing disclaimers and found

19 disclaimers are traditionally displayed in the product specification details where

20 consumers look to find more information about the product.  *Id.* ¶52.  Indeed, this is

21 similar to the approach ISE *itself* has taken with its own garbage disposal products.

22 Against the backdrop of Joneca's counterclaim alleging that ISE's horsepower claim

23 (of the peak output horsepower of the motor) is false and misleading, ISE has now

24 implemented disclaimers for online websites offering its Builder series garbage

25 disposals.  Tellingly, just like Joneca, ISE has applied a disclaimer in the product

26 description page.  *Id.*  If anything, Joneca's approach is even *more* conspicuous than

27 ISE's, because ISE's does not embed the text of the disclaimer directly into the

28 product bullet points (as Joneca's does), but rather uses a footnote reference,

17

1   redirecting the consumer to yet another location on the page with even finer print.

2   *Id.* There can be no doubt that when the time comes for ISE to defend its false and

3   misleading horsepower claims that ISE will contend that this disclaimer qualifies as

4   "clear and conspicuous."    ISE's aspersions against Joneca's more prominent

5   disclosure are belied by its own conduct.

6      Finally, to the extent ISE suggests that *any* mention of horsepower online

7   would require the disclaimer immediately next to it, nothing in the Order would

8   convey that online disclaimers need to accompany *every* single mention of

9   horsepower.  Indeed, ISE's injunction proposal also requested this relief, ECF 69 at

10   3 (requesting stickers to "obscure every instance of" horsepower on "packaging,

11   product displays . . . or online"), but the Court did not adopt it.  Rather, the Court

12   expressly required that *one* sticker be applied to physical packages, even though these

13   packages include multiple references to horsepower.  *S*ee ECF 71 at 18 n.10

14   (discussing a singular "disclaiming sticker on package") & 19 (same); ECF 80

15   (approving mock-ups with a single disclaimer sticker for product packaging).

16      Fundamentally, Joneca's decision to implement the disclaimer in the first

17   possible place, and multiple places whenever possible, is a "good faith and reasonable

18   interpretation" of the Court's order, which is notably silent as to how online

19   disclaimers are to be handled.  *In re Dual-Deck*, 10 F.3d at 695; *see also* ECF 71 at

20   18, n.10 (describing requirements for "the disclaimer sticker on packages" but

21   providing no guidance as to how disclaimers are to be applied online).  ISE falls far

22   short of meeting its burden of proving by clear and convincing evidence that Joneca's

23   disclaimers violate the Order.

24      **D. Online Search Results Pages Are Not Encompassed By The Order.**

25      ISE extends its overreach campaign by arguing that thumbnail image search

26   results for third-party websites like Amazon somehow must display the disclaimer.

27   Mot. at 5-6.  Reflective of ISE's effort to search every nook and cranny for a

28

horsepower reference, no matter how small, this demand has no basis either in the Court's Order or in the marketplace.

As ISE admits, Mot. at 6, "search results" pages plainly are not contemplated by the Order. Indeed, the Order gives no indication that the thumbnail images of Joneca-made products or product names that show up on a third-party's search results page should bear a disclaimer. *See generally* ECF 71. ISE contends that this is because the Order "cannot possibly spell out every permutation of how a disclaimer should appear," Mot. at 12, but there is nothing in the Order, or the briefing history that predated it, that would support ISE's interpretation.

Online search results on third-party platforms do not reasonably constitute "advertising, marketing, promotional, or other commercial materials," as contemplated by the Order. *Id.* at 19. The online search results page simply provides a potential customer with options that, with a click, take the consumer to the product-specific page where more detail—including, in this case, clear and conspicuous disclaimers—is available. It is no different from a customer who walks into a retail store and asks an employee where to find the garbage disposals, and is directed by the employee to the correct aisle. Any reasonable consumer would know that a search result does not provide full information regarding the product and would not expect or need to see a disclaimer in this setting. If a consumer is interested in a Joneca-made disposer as a result of a product search, the consumer will click on the product page and find the disclaimer at the appropriate point-of-sale.

Joneca's interpretation of the Order is all the more reasonable when considered from a practical standpoint. As ISE itself acknowledges, search results pages provide little room for text. Mot. at 6. Realistically, it is simply not feasible to include the disclaimer on the thumbnail image or product title shown on search results page, as ISE suggests. Chavez Decl. ¶55. Not only would adding the disclaimer to the thumbnail image require a font so small it would render the disclaimer completely illegible, but most retailers, as policy, do not permit text on these images. *Id.* And

there is not enough character space to accommodate the 98-character disclaimer in the search results text box. *Id.* Joneca's counsel in written correspondence and in both meet-and-confers repeatedly asked ISE to provide an example of a disclaimer proposal for search results and received no response. Mandel Decl. ¶¶5, 8. Joneca is not aware of any examples from any other consumer context of disclaimers included in online search results pages. Chavez Decl. ¶55. ISE provides none.

What ISE truly seeks is a second bite at the apple to broaden the scope of the Order. *See* Mot. at 6 ("If Joneca cannot feasibly insert a disclaimer into the product title or search result, then the only compliant alternative is to remove the horsepower claim from search results."). ISE effectively asks the Court to order Joneca to remove its products from search results or to remove horsepower classifications from its search results. *See id.* Both of these would be draconian actions essentially designed to keep Joneca from competing in the online marketplace. The Court previously declined to adopt ISE's proposal to "obscure" Joneca's horsepower claims altogether and delete all "online references to 'HP,'" which would have removed any ability for Joneca to distinguish between the different sizes and power capabilities of its models. See ECF 69 at 3. The Court should once more reject this request.

Neither the text nor spirit of the Order restrains Joneca from having its products captured by search results pages or requires Joneca not to designate its disposers by horsepower category. Joneca's interpretation of the Order is at the very least a "reasonable interpretation" of the Order sufficient to defeat any alleged violation. *See In re Dual-Deck*, 10 F.3d at 695. ISE has not proved any violation of the Order by Joneca by clear and convincing evidence.

### E.    Coercive Sanctions Are Not Warranted.

Having failed to establish any violation of the Order by Joneca, ISE's request for coercive sanctions has no basis in law. Joneca is in substantial compliance with the Order as set forth more fully above. *See supra* Section IV.A-D. As such, there

1    is no need for sanctions to "coerce [Joneca] into compliance." *Shell Offshore Inc. v.*

2    *Greenpeace, Inc.*, 815 F. 3d 623, 629 (9th Cir. 2016).

3    Contrary to ISE's baseless accusations that Joneca made "no effort at all" to

4    comply with the Order, Mot. at 10, Joneca has taken the Order extremely seriously.

5    Over the past year, Joneca has invested no less than ███████ to diligently

6    implement the Court's Order.  In light of these comprehensive efforts, and ISE's

7    failure to prove any violation of the Order by clear and convincing evidence, ISE's

8    request for sanctions is wholly inappropriate.  *See, e.g.*, *Harbor Breeze Corp. v.*

9    *Newport Landing Sportfishing, Inc.*, 2020 WL 816135, at *8 (C.D. Cal. Jan. 23,

10   2020) (rejecting contempt sanctions where "[b]y all accounts, Defendants have gone

11   to considerable lengths," spending over 600 hours over three months, to substantially

12   comply with injunction order). The Court should deny ISE's requests for an order

13   declaring Joneca is in violation of the Order, for a "comprehensive compliance

14   report" detailing "exactly what has been done to cure each deficiency," and to

15   "fashion additional remedies to ensure compliance." *Id.*  The disclaimer is present

16   in the brick-and-mortar and online marketplaces as ordered.  It is clear from ISE's

17   thin evidence and failure to meaningfully meet-and-confer that ISE's motivation is

18   to improperly expand the relief that it obtained in the Order and further strain

19   Joneca's limited resources.

20   **V.    CONCLUSION**

21   For the foregoing reasons, Joneca respectfully requests that Plaintiff's Motion

22   to Enforce be denied.

23

24

25

26

27

28

21

1

Respectfully submitted,

2

3

Dated: September 19, 2025

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HOGAN LOVELLS US LLP

*/s/ Trenton H. Norris*

Trenton H. Norris

*Attorneys for Defendants*
JONECA COMPANY, LLC and
THE JONECA CORPORATION

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO ENFORCE
Case No.: 8:24-cv-02600-JVS-ADS

1

### **Certificate of Compliance**

2          The undersigned, counsel of record for Defendants Joneca Company, LLC and

3   The Joneca Corporation certifies that this brief contains 6,992 words, which complies

4   with the word limit of L.R. 11-6.1.

5

6
    Dated:  September 19, 2025                        */s/ Trenton H. Norris*
7                                          _____

8                                          Trenton H. Norris

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28